## BLEVINS v. DRAKE–LINDSAY CO., Inc., et al.*

### No. 4356.

Court of Appeal of Louisiana. Second Circuit.

Nov. 10, 1932.

Irion & Switzer and C. B. Emery, all of Shreveport, for appellants.

Thornton, Gist & Richey, of Shreveport, for appellee.

PALMER, J.

Plaintiff is suing to recover the sum of $351.53 as damages to his automobile, which he alleges were occasioned by a collision between his automobile and the automobile of defendants in a street intersection in the city of Baton Rouge, La., through the fault and negligence of the defendants.

On June 6, 1931, about the hour of 10:30

---

*Rehearing denied December 16, 1932.

p. m., plaintiff's son, Edwin Blevins, Jr., who was a student at Louisiana State University, was driving plaintiff's car south on St. Hypolite street in the city of Baton Rouge, which runs north and south, and defendant M. W. Drake, who is an officer in the company of defendant the Drake-Lindsay Company, Incorporated, was driving defendant's car eastward on Laurel street, which runs east and west, and a collision occurred between their cars in the street intersection, resulting in damages to both cars and also in personal injuries to Mr. Drake.

These two streets cross at right angles, and it appears that the collision occurred while the front wheels of plaintiff's car were at or near the south curb on Laurel street. There is a board fence several feet high paralleling Laurel street on the north side and sitting back a few feet from the sidewalk. A party approaching Laurel street from the north cannot see westward on Laurel street until he has cleared himself of this board fence. On the occasion in question, plaintiff contends that his said son, as he approached this intersection, slowed down, looked both ways, and seeing no car within a reasonable distance, proceeding to cross the intersection at a slow rate of speed, but that when he reached a point almost entirely across the intersection, defendants' car, driven by defendant M. W. Drake, running at a rate of speed in excess of 40 miles per hour, "bore down upon him," and that, although his son attempted to turn to the left and get out of the way of defendants' automobile, doing all he could to avoid being struck, defendants' car ran into the side of plaintiff's car, "crushing the running board, denting in the right side, breaking the door glass, bending the door, crushing the rear fender, bending and breaking the front spring, bending the axle, knocking the wheel out of shape, and otherwise injuring and damaging petitioner's automobile."

He further alleges that the collision and the damages to his car resulting therefrom were occasioned by the gross fault and negligence of the said M. W. Drake, in operating his car at a dangerous and reckless rate of speed, in violation of an ordinance of the city of Baton Rouge and of the laws of the state of Louisiana, as well as in utter disregard of the lives and property of others. He itemized his damages as follows: $175 for repairs to his car; $13.40 to replace a tire that was ruined in the collision: $1.25 for a headlight lens, broken in the collision; $10.88 to cover his expenses to Baton Rouge to recover his car after it was repaired; and $150 to cover general depreciation of the car.

Defendants denied that they are responsible for the collision resulting in plaintiff's alleged damages to his automobile. On the contrary, they pleaded that the collision resulted entirely from the gross negligence and fault of plaintiff's son. By reconventional demand, defendants averred, in effect, that on the occasion of the collision, defendant M. W. Drake, driving a Chevrolet coupé, owned by the defendant Drake-Lindsay Company, Inc., and traveling east on Laurel street in the city of Baton Rouge, drove his said automobile into the said intersection, at which time he observed the approach of plaintiff's car on St. Hypolite street, and that said car was approaching rapidly along St. Hypolite street from his left; that realizing that the Oakland sedan, driven by plaintiff's minor son, was not going to stop, he (Drake) "turned his car sharply to the right, giving the Oakland sedan a chance to turn to its left and proceed out Laurel Street, which it could easily have done, if going at the rate of speed alleged in plaintiff's petition." But that instead, the driver of the Oakland sedan continued on St. Hypolite street, striking defendants' automobile, causing their car to cross the curb and sidewalk and go upon the yard of Dr. Flowers, at the southeast corner of the said intersection; that in the collision and as a result of defendants' car being forced upon the curb and sidewalk and into the said yard, it had the left front wheel and front axle knocked out of line; that the left front fender was crushed; and that the automobile was generally bent and crushed, breaking one axle and a windshield, the center bar of the front bumper, as well as breaking and damaging other parts of the car.

Defendants averred that at the time of the collision, the said M. W. Drake was traveling at a moderate and safe rate of speed and was keeping a proper lookout, and was driving in a careful manner; that he entered the intersection first and had the right of way, under an ordinance of the city of Baton Rouge; and that if plaintiff's said son had obeyed the laws and ordinances, the accident would not have occurred.

Defendants further alleged that, as a result of the collision and through the fault and negligence of plaintiff's said son, their automobile was damaged in the sum of $94.94, which sum was expended as repairs occasioned by the collision. They further alleged that in addition to the said repairs, the car was damaged by depreciation in the sum of $100.

Defendants further alleged that the said M. W. Drake was thrown forward in the automobile and knocked unconscious; that he was taken to the sanitarium and did not regain consciousness for about nine hours; that in the collision his left collar bone was broken, and that he suffered severe contusions and bruises about the body, with serious lacerations above the left eye, under the angle of the left jaw, and that he received bruises on the back of his head and on the left chest, causing him great pain; that for a week after the accident he was required to take opiates

and sedatives to relieve his pain and suffering; that he was confined to his bed for several days and to his home for two weeks, but that even then he continued to suffer pain in his collar bone for four weeks; that as a result of the said accident, he had a constant headache for two weeks and has continued to suffer severely with intermittent headaches, a kind which he had never suffered prior to the accident; and that as a result of the accident, he has spent in the way of hospital bill, physician's bill, X-ray bill, and transportation from Baton Rouge to Shereveport, his home, the sum of $62.39. He claims for pain and suffering, $500; for injury to his collar bone, $1,000; for shock, $500—making the total claimed in his reconventional demand, $2,062.39.

Defendant Drake-Lindsay Company, Inc., in addition to the damages above set forth, claimed that defendant M. W. Drake was employed by it at an annual salary of $3,900, and that during his illness they paid his salary, amounting to $300. They further averred that they were without the use of their said automobile for seven days, as a result of the collision, and that they are entitled to compensation therefor at the rate of $5 per day, or a total of $35. The total amount of the reconventional demands of both defendants is as follows: Drake-Lindsay Company, Inc., $529.94; M. W. Drake, $2,062.39; making a total of $2,592.33, for which they seek judgment against plaintiff.

In the alternative, defendants pleaded that the collision was the result of negligence on the part of plaintiff's said son, contributing to the damages received, thereby barring plaintiff from recovery.

On these issues, the case went to trial in the district court, resulting in a judgment in favor of plaintiff and against the defendants, in solido, in the sum of $251.53, with interest and costs. The judgment of the lower court does not deal specifically with the defendants' reconventional demands. However, the minutes show that the reconventional demands were rejected. From this judgment, defendants have appealed. Plaintiff has answered the appeal and asked for an increase in the judgment to the amount sued for.

### The Facts.

■ There was in plaintiff's car at the time of the collision with his said son, Edwin Blevins, Jr., one Gordon Ogden. In the defendants' car, besides the defendant M. W. Drake, there were two other parties, viz., E. C. Clifton, a traveling salesman, and another man, E. M. Ream, making his home at the time in Baton Rouge. Edwin Blevins, Jr., plaintiff's son, was asked the question:

"Tell the court how the accident happened?"

To this he replied:

"A. Well, I was driving south on St. Hypolite Street at a moderate rate of speed and approached Laurel Street and I slowed down to almost a stop and I looked west on Laurel Street and saw Mr. Drake's car I guess about three-quarters of a block away. I couldn't see up the street until I was about 17 feet away from the corner of the intersection, and I glanced both ways and everything was clear on the other side and Mr. Drake's car seemed to be driving at a moderate rate of speed —I couldn't tell anything about it that far away, but after I got about the intersection of the street I noticed that he was traveling faster than I anticipated, so I saw he was going to strike me so I tried to speed up and the front end of my car passed the line of the curb on Laurel Street, and I tried to cut to the left and Mr. Drake's car cut to the right hitting my car about the intersection of the front fender and the runing board and his car— "

Gordon Ogden, the other occupant of plaintiff's car, testified that he and plaintiff's said son started from a drug store on Main street, about eight blocks away from where the accident occurred; that they entered St. Hypolite street and proceeded to travel south; and that when they approached the Laurel street intersection, they were going between 10 and 15 miles an hour; that when they approached the intersection, they looked for traffic on Laurel street, at which time they saw a car that appeared to be just crossing the next street to the west, about a block away; that they saw this car as soon as they had come close enough to the intersection to see down Laurel street, and at that time the car, which proved to be the Drake car, was about a block away. He further testified that as it was night and the lights of the Drake car shining brightly on them, it was impossible to estimate the speed of the Drake car, but he said it looked to them as though they had sufficient time to cross the intersection with apparent safety. He said that after they got into the intersection, they discovered that the Drake car was coming a lot faster than they expected, at which time they could not turn, so young Blevins gave the car a little more gas to quicken up its speed, in order to try and make it across the intersection; that Blevins did turn his car to the left in an effort to avoid the collision, but about that time the Drake car hit them about where the runing board meets the fender on the right side. He said that at that time the Blevins car was about a foot past the curb, that is, the curb on the south side of Laurel street; and that when the Drake car struck them, it shoved them over the curb, leaving part of their car on the sidewalk and part on the neutral ground.

Young Blevins also testified that when the Drake car hit his car, the back end of his car was about the center of the intersection line, and that the front end had just passed the line of the curb on Laurel street. He also testified that his car was knocked upon the curb of St. Hypolite street on the east side, with the back end on the neutral ground and the front end on the sidewalk.

Let us next see what, if anything, the three occupants of defendants' car have said concerning the accident:

We come first to the testimony of M. W. Drake. His evidence is brief, but seems to be straightforward and unequivocal. When asked to tell the court what he remembered about this collision, he very frankly replied:

"I do not remember anything about it. I remember taking Mr. Ream and Mr. Clifton in the car and starting out Laurel Street, and the next thing I remember I was in the Lady-of-the-Lake Hospital the next morning at seven o'clock, when I woke up."

We find that the testimony of E. M. Ream, another one of the occupants of the defendants' car, gives no facts concerning the accident. The following questions and answers test the weight of his evidence:

"Q. Were you with Mr. Drake and Mr. Clifton on the occasion of an automobile accident on June 6 of this year? A. Yes.

"Q. Do you remember anything about the accident? A. Not very much. It just happened—that is about all I could tell you. The first thing I knew there was a lot of noise and a crash. I didn't know where I was going. I think I got knocked goofy, because I didn't know anything about it until fifteen minutes afterwards."

The witness Clifton, the one other occupant of defendants' car, testified that he had been with Mr. Drake practically all the day before the collision. After testifying that he was in the car at the time with Drake and Ream, traveling eastward on a street which is admittedly Laurel street, he was asked the question:

"Tell us what occurred at the intersection of Laurel and St. Hypolite Streets? A. Mr. Drake was driving, as I have stated. We were going down this street, and before entering the intersection I saw the lights of the other car. We were going at a moderate rate of speed and so was the other car. I said, 'Mr. Drake, watch him', you know, cautioning him. He said, 'No. He will stop; we have the right-of-way'; but he didn't stop, and the next thing we were over in a man's yard."

He further testified that he first saw the Blevins car just before they (the occupants of defendants' car) entered the intersection, probably a car's length away; that both cars hit the intersection about the same time; that both were traveling at about 20 to 25 miles per hour at the time of the collision. He said that the Blevins car hit the Drake car first on the left front wheel and fender.

It is clear, therefore, that since neither defendant Drake nor witness Ream were able to make any statement whatever concerning the accident, the only conflict in the testimony is between that of young Blevins and the witness Ogden on the one side, and Clifton on the other.

The undisputed facts further show that the Drake car, after the collision, finished passing across St. Hypolite street, entered over the curb, crossed the neutral ground over the sidewalk, across part of the lot and onto the residence of Dr. E. P. Flowers, and continued to travel until it reached a wistaria vine, at the edge of Dr. Flowers' residence, which braced it up. In traveling across Dr. Flowers' lot, the car knocked down an arbor, breaking off a post and breaking and bending another. The radiator was up against the wistaria vine and was within two feet of Dr. Flowers' porch.

These physical facts corroborate plaintiff's two witnesses to the effect that the defendants' car was traveling at an excessive rate of speed at the time of the collision. Apparently, defendants' car had shoved, or assisted in shoving, plaintiff's car across St. Hypolite street and up over the curb, onto the neutral ground and sidewalk, while the Drake car continued to go forward, breaking down this arbor and stopping at or near Dr. Flowers' porch, in a network of vines. Certainly the car must have been making a greater speed than the witness Clifton estimated. No one testified that plaintiff's car was traveling at a fast rate of speed.

We are constrained to doubt one particular part of Clifton's testimony. He said that just before reaching the street intersection, he had a conversation with defendant Drake, in which he called Drake's attention to the Blevins car, suggesting to Drake to watch it and he said Drake replied, "No, he will stop; we have the right-of-way." If such a conversation occurred, it certainly took place before Drake was knocked unconscious in the collision, and if it did occur, it was at a time when Drake had his full senses; so the fact that Drake had no recollection of any part of the collision—not even to seeing the car of plaintiff—convinces us that the witness Clifton has drawn sharply on his imagination in this particular. We think, if such a conversation had occurred, Drake would have candidly and frankly said so, as he manifested clearly he had no disposition to do otherwise, and the fact that he had no recollection of it leads us to believe that it did not occur.

██ The two occupants of plaintiff's car have been very definite, certain, and apparently fair in their description of the collision. We are impressed with the thought that they

have given the true version of the case. If so, when they approached the intersection with care and with a proper lookout, they saw Drake's car from three-fourths to a block away at the time they entered the intersection, and this being at night and nothing to suggest to them that Drake was not observing the law, concerning the rate of speed he was permitted to make, they had a perfect right to assume that he was traveling within the lawful limit of speed, so they were not at fault when they proceeded in their efforts to cross the intersection.

■ After they were well within the intersection, at a time when it was too late to avoid an accident, they observed for the first time that the Drake car was coming at a rapid rate of speed, and thereupon and thereafter they appeared to have done everything within their power to avoid the accident. When the driver of plaintiff's car, at the time he first entered the street intersection, looked for the approach of cars on Laurel street and found defendants' car at that time from three-fourths to a block away, we think he did all that the law required of him, for it is certain, if the Drake car had been traveling within the lawful speed limit, plaintiff's car would have had ample time to cross ahead of it. Young Blevins had a perfect right to assume that Drake would obey the speed laws. It may be said that a driver, entering a street intersection, is only required to act as a reasonable person would, under similar circumstances. The recognized rule may be stated as follows:

■■ If an automobile driver, acting as a reasonable, cautious, and prudent person, and not being aware that a car he sees at some distance away is exceeding the speed limit, believes that he will be able to drive over an intersection in safety, it is not negligence in him to proceed to cross the intersection. A driver is not required to do what often is an impossibility, that is, to determine whether or not an approaching automobile on another street is violating the speed limit. As stated, the test is not the actual speed which the other car is making, but rather whether or not the driver of the car attempting to cross the intersection in front of an oncoming car, acted as an ordinary, prudent, reasonable, and cautious person would have done under similar circumstances.

We have had occasion to-day, in the case of E. Clint Hamilton v. Elmo P. Lee, et al., 144 So. 249, to review at length this identical question. In that case, as in the case at bar, the question involved the rights of drivers of automobiles at street intersections. In that case, as in this case, we hold that, while the driver of the car of plaintiff saw, or could have seen, the approach of the other car, yet the approaching car was at such a distance as to justify the driver of the car attempting to cross the intersection in the belief that there was sufficient time to cross the intersection in safety, before the approaching car could reach the intersection. In that case, as in this, the driver of the car crossing the intersection was mistaken, because the approaching car was being driven at an excessive rate of speed. In that case, and we hold in this case, the driver of the approaching car was traveling at an excessive rate of speed, was not keeping a proper lookout and apparently made no effort to avoid the collision.

Since in the case of Hamilton v. Lee, supra, we have cited numerous authorities sustaining the views herein expressed, we deem it unnecessary to do more here than to refer to that decision for our authorities in support of these conclusions.

We are therefore of the opinion that this collision happened solely through the fault of the driver of defendants' car; and having reached that conclusion, it is unnecessary to consider further defendants' reconventional demand or their plea of contributory negligence.

### Quantum of Damages.

■ The lower court allowed plaintiff damages in the sum of $251.33. If defendants are liable at all, there can be no question as to their liability up to the amount of the items covering repairs which plaintiff paid out, as the result of this collision, and which total $200.53. In addition to this sum, he is claiming $150, for damages covering general depreciation of the car. This makes his total claim amount to $351.53. It would seem, therefore, that the district court fixed the damages on the general depreciation of the car at $50. The proof of this question as to the actual value of such depreciation is more or less uncertain. Certainly it is not definite enough to justify us in disturbing the findings of the district court.

We are therefore of the opinion that the judgment appealed from is correct, and it is accordingly affirmed; appellants to pay all costs of appeal.